UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
IN RE EX PARTE APPLICATION OF    :      24 MC _____
NAVIOS SOUTH AMERICAN        :
LOGISTICS INC.              :
-----------------------------------------------------X

## DECLARATION OF KEVIN J. LENNON

Pursuant to 28 U.S.C. § 1746, Kevin J. Lennon declares under the penalty of perjury the following:

1.      I am 'Of Counsel' to the law firm of Lennon, Murphy & Phillips, LLC, which represents the Petitioner, NAVIOS SOUTH AMERICAN LOGISTICS INC. ("Petitioner" or "NSAL") and I make this Declaration based upon my own personal knowledge and also following review of documents and information which have been provided to me that I know, or believe, to be true and accurate.

2.      This Declaration is submitted in support of NSAL's ex parte Petition for an Order for Discovery Assistance pursuant to 28 U.S.C. § 1782(a).

3.      NSAL seeks this Court's authorization to take discovery within the District for use in the prosecution of a foreign proceeding in the High Court of the Republic of Marshall Islands that NSAL has commenced against Claudio Pablo Lopez and Carlos Augusto Lopez ("Defendants").

4.      NSAL's Complaint filed in the High Court of the Republic of Marshall Islands asserts seven (7) claims against Defendants concerning their breach of duties as directors and executive officers of Petitioner, fraud, unjust enrichment, civil conspiracy, and conversion. *A true and correct copy of NSAL's Complaint is attached hereto as Exhibit 1 ("Ex. 1").*

5.     Specifically, NSAL's Complaint alleges that the Defendants engaged in a scheme to defraud Petitioner out of millions of dollars.  Pursuant to their scheme, Defendants – who were directors and executive officers of Petitioner – directed individual NSAL employees to create fake and forged invoices and to falsify accounting records in order to conceal improper payments made by Petitioner, at Defendants' direction, to Defendants and members of Defendants' family in Buenos Aires, Argentina.  *See Ex. 1.*

6.     The Defendants also caused Petitioner substantial harm by authorizing a family member to disclose confidential information regarding bunker fuel supplier bids with one of Petitioner's fuel suppliers owned and/or controlled by a family member related to Defendants.  Defendants thus corrupted and rigged the Petitioner's fuel bidding process, impermissibly steered Petitioner's funds to their family, forced Petitioner to receive substandard and insufficient services, and caused Petitioner to incur losses based on the terms of the bunker fuel contracts.  *Id.*

7.     Additionally, the Defendants further looted Petitioner's coffers by using Petitioner's "petty cash", credit cards and other accounts for personal expenses entirely unconnected to Petitioner's business.  *Id.*

8.     Based on a comprehensive investigation, which is continuing, NSAL has discovered extensive documentation of the Defendants' wrongdoing which includes including forged and fake invoices, fictitious purchase orders, bank statements and receipts, and email and text message correspondence (including WhatsApp and other messages sent to and from Defendants).

9.    Such documentation has been corroborated by information provided by NSAL employees and substantiates the knowledge, participation, and orchestration by the Defendants in the scheme carried out against NSAL.

10.    Upon information and belief, the funds stolen from NSAL have been deposited into numerous bank accounts and/or credit facilities located in New York, and elsewhere, and have also been used to purchase and/or pay debt on various assets in multiple jurisdictions, including New York.

11.    Upon information and belief, it is believed that the Defendants have at least ten (10) bank accounts, credit facilities located and a correspondent bank account situated in New York as well interest in a property located at 207 E. 57th Street, Unit 19B, New York, NY 10022 (the "New York property").

12.    Upon information and belief, the bank accounts, credit facilities,  and correspondent bank accounts are as follows:

  a.    An account in the name of Carlos Augusto Lopez at Wells Fargo Bank bearing account number ███████;

  b.    An account in the name of Carlos Augusto Lopez at UBS Ltd. bearing account number l█████████████;

  c.    An account in the name of Claudio Pablo Lopez at Standard Bank bearing account number ██████████

  d.    An account in the name of Carlos Augusto Lopez at Banco Santander bearing account number ████████;

  e.    Credit facilities at Citibank in the name of Claudio Pablo Lopez bearing credit number ████████████ and account number 24535806;

  f.    Credit facilities at Citibank in the name of Claudio Pablo Lopez bearing credit number 4███████████ and account number ████████;

g.    Credit facilities at Citibank in the name of Claudio Pablo Lopez bearing credit number ███████████and account number ███████;

h.    Credit facilities at Citibank in the name of Claudio Pablo Lopez bearing the credit number ███████████ and account number ███████;

i.    Credit facilities at American Express Bank in the name of Carlos Augusto Lopez bearing credit number ███████████ and

j.    Correspondent bank accounts with Bank of America and Bank of New York Mellon for Swiss bank accounts.

13.    An entity named Boca World LLC, owns the New York Property, and is in turn itself owned by a Marshall Islands entity named NYA Corp.  Defendant Claudio Pablo Lopez is the President of NYA Corp. and, upon information and belief, the sole shareholder of NYA Corp.  *See true and accurate signed statement of  Claudio Pablo Lopez attached hereto as Exhibit 2*.

14.    Upon information and belief, NYA Corp. is owned by an entity named Toram Trust, which is a Lopez family trust, and the likely ultimate beneficial owner of Boca World.  The Toram Trust members are all members of Claudio Pablo Lopez's immediate family – namely Maria Fernanda Dieguez, Lucia Lopez, Maria Lopez, Tomas Lopez, Valentina Lopez and Augustina Lopez.

15.    I have been advised by NSAL's Marshall Islands lawyers that the High Court of the Republic of Marshall Islands will be receptive to this Court's assistance in discovery and there is no procedural prohibition against NSAL seeking discovery in the United States.

16.    NSAL has not filed this Petition as a means of circumventing discovery limits under the rules governing the High Court of the Republic of the Marshall Islands,

and I have been advised by NSAL's Marshall Islands lawyers that no discovery limits have been set in the High Court action.

17.     Upon information and belief, and based on my own investigation, all of the parties from whom discovery is sought are either located within this District or are within the jurisdictional limits of the Court's subpoena power.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Southport, Connecticut this 10th day of December, 2024.

Kevin J. Lennon

EXHIBIT 1



REEDER & SIMPSON, P.C.
Dennis J. Reeder
Bar Certificate No. 80
P.O. Box 601
Majuro, MH  96960
Telephone: +1-692-625-3602
Honolulu Telephone: 808-352-0749
Email: dreeder.rmi@gmail.com

ISRAEL DAVID LLC
Israel David (*pro hac vice* forthcoming)
17 State Street, Suite 4010
New York, NY  10004
212-739-0622
israel.david@davidllc.com

*Additional counsel on signature page*

**IN THE HIGH COURT
REPUBLIC OF THE MARSHALL ISLANDS**

| | |
|---|---|
| Navios South American Logistics Inc., a Republic of the Marshall Islands Corporation,<br><br>          **Plaintiff,**<br> - against -<br><br>Claudio Pablo Lopez and Carlos Augusto Lopez,<br><br>          **Defendants.** | Civil Action No. 2024-<br><br>HCt-Civil-Majuro<br><br>**COMPLAINT** |

   Plaintiff Navios South American Logistics Inc. ("NSAL") submits this Complaint against Claudio Pablo Lopez and Carlos Augusto Lopez (together, "Defendants").  NSAL, together with each of its wholly owned subsidiaries, is referred to herein as the "Company."

**JURISDICTION AND VENUE**

   1.  This Court has subject matter jurisdiction under Article VI, Section 3 of the Constitution of the Republic of the Marshall Islands and 27 MIRC Ch. 2 § 213.

1

2.      The Court has personal jurisdiction over Defendants under 27 MIRC Ch. 2 § 251(h), 251(i), and 251(n).

3.      Additionally, personal jurisdiction in the Republic of the Marshall Islands ("RMI") over Defendants – each of whom were Directors of a corporation organized under RMI law (NSAL) who are sued in their capacity as such – comports with due process, RMI law, Delaware law, and a logical allocation of judicial resources. *See Frontline, Ltd. v. DHT Holdings, Inc.*, No. 2017-092, June 17, 2017 Order at 14-15 (High Court of the Republic of the Marshall Islands).

## NATURE OF THE ACTION

4.      For at least approximately 10 years, Defendants engaged in a brazen scheme to defraud NSAL out of millions of dollars. Pursuant to this scheme, Defendants – who were Directors and executive officers of NSAL – orchestrated a scheme in which a small handful of employees at the Company were directed to create fake and forged invoices and to falsify accounting records in order to conceal improper payments made by the Company, at Defendants' request, to Defendants and members of Defendants' family (the "Lopez Family") in Buenos Aires (the "Fraudulent Invoices Scheme").

5.      At a high level, the Fraudulent Invoices Scheme worked as follows: at the direction and behest of Defendants, individuals at the Company were instructed to make enormous amounts of cash available to Defendants and other members of the Lopez Family out of Company funds. As orchestrated by Defendants, these individuals concealed each illicit cash payment to Defendants and their family by generating a fictitious invoice pursuant to which a demand for Company funds would then be made. The amount of the demand would cover the illegitimate payment being made to Defendants and other members of the Lopez Family, as well as, on many

or most occasions, a fee to be paid to Defendants' "fixer" ("Co-Conspirator 1") in consideration for facilitating the payment of stolen Company funds.

6.      In response to this demand, a Company employee – working at the direction and behest of Defendants – would issue a Company check made out to an individual, who would then physically visit the bank and make a cash withdrawal in person.

7.      At Defendants' direction, the cash would then be transported to a money exchange for onward transfer to Buenos Aires for the benefit of Defendants and certain other members of the Lopez Family.  At times, due to the sheer amount of physical cash being transferred, an armored vehicle company would be engaged to transport the money from the bank in Paraguay that held the Company's accounts to the money exchange.  The use of armored vehicles for transporting cash was entirely unprecedented at the Company, completely outside the Company's ordinary course of business, and wholly unnecessary for any legitimate Company business.  The enlistment of armored vehicles was instead purely a function of Defendants' theft of Company funds.

8.       To conceal this flagrant and enormous theft of Company money, Defendants directed that forged or fake invoices repeatedly be created to record the transactions as purported payments to Company vendors.  In reality, no such legitimate payments were actually made to these vendors in relation to these invoices.  The money instead went to Defendants and other members of the Lopez Family.

9.      The forged invoices were created by taking otherwise legitimate invoices from vendors that individuals at the Company as directed by and on behalf of Defendants then altered to include fictitious scopes of work, with associated charges equaling the exact amounts withdrawn for the illicit payments to Defendants.  The forged invoices also falsely attributed portions of the total payments to additional charges.  In practice, those portions were not ultimately used for

additional charges at all, but instead covered Co-Conspirator 1's "fees" for arranging the improper payments to Defendants and the Lopez Family.

10.     In addition to the *forged* invoices, Defendants and their accomplices orchestrated numerous *fake* invoices, issued by a handful of vendors who agreed to be part of Defendants' scheme by explicitly permitting Defendants to generate invoices for fictitious, non-existent work. The fake invoices falsely reflected the misappropriated payments in cash to Defendants as expenses for Company projects (often referred to within the Company as "concepts").

11.     Due to Company practices and processes, some "concepts" required additional supporting documents before payments could be recorded within the Company's accounting system. In these instances, Defendants and other members of the Lopez Family instructed individuals at the Company to create fictitious purchase orders and other concocted supporting documentation in order to enhance the apparent (but non-existent) legitimacy of the fraudulent invoices.

12.     All told, between 2015 and 2020 Defendants looted at least approximately $8.2 million in Company funds through the Fraudulent Invoices Scheme, which involved ten (or more) external vendors and several individuals acting at Defendants' direction and behest. NSAL's investigation into the Fraudulent Invoices Scheme is still ongoing, and may well reveal further extensive misconduct and misappropriation by Defendants, including for periods prior to 2015.

13.     Defendants further caused the Company substantial harm by authorizing and permitting Maria Lopez, Defendant Claudio Lopez's daughter and Defendant Carlos Lopez's niece, to share confidential Company information regarding bunker fuel supplier bids with Ms. Lopez's husband's company, one of the Company's fuel suppliers. The Company's policy and standard practice was to invite competitive bids from multiple fuel suppliers in order to secure

requisite fuel for the Company's operations. But Defendants authorized and permitted the Company's fuel bidding process to be corrupted and rigged in favor of the Lopez Family, impermissibly steered Company funds to the Lopez Family through contracts with Ms. Lopez's husband's company, forced the Company to receive woefully substandard and insufficient services from this supplier, and caused the Company to incur losses based on the terms of the contracts with this supplier (the "Bunker Fuel Scheme").

14.     Throughout this time, Defendants further looted the Company's coffers by using Company "petty cash" and other accounts for luxury personal and family expenses entirely unconnected to Company business, including expensive cigars, high-end personal transportation expenses (such as the expenses  for Defendants' private plane deployed for personal travel), a specialized washing machine designed to launder horse blankets, robot vacuum cleaners, a clothes dryer, and other expenses for miscellaneous and unauthorized personal goods and services (the "Personal Piggybank Scheme").

15.     As set forth in this Complaint, by engaging in the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme, Defendants breached their fiduciary duties to NSAL under Marshall Islands law, which governs here.  Defendants' conduct also constitutes fraud, conversion, and civil conspiracy, and Defendants were unjustly enriched through the schemes described herein.

16.     NSAL brings this action to recover the money and assets looted by Defendants, along with prejudgment interest thereon.

## THE PARTIES

17.     Plaintiff NSAL is a non-resident domestic entity incorporated in RMI and is one of the largest infrastructure and logistics companies in the Hidrovia region of South America.  Non-

party Navios Maritime Holdings Inc. ("Navios Holdings") beneficially owns approximately 63.8% of NSAL's outstanding common stock. The remaining 36.2% of NSAL's common stock is owned by Peers Business Inc., a wholly owned subsidiary of Sinimalec S.A. ("Sinimalec"). Defendants collectively own two-thirds of Sinimalec. The remaining third of Sinimalec is owned by the estate of Defendants' deceased brother, Horacio Lopez.

18.     Defendant Claudio Pablo Lopez previously served as a member of, and Vice Chairman of, NSAL's Board of Directors – a position he held from January 3, 2008 until August 19, 2024. He also previously served as NSAL's Chief Executive Officer from January 3, 2008 until October 6, 2022. Defendant Claudio Lopez is a 33.3% owner of Sinimalec (the 36.2% indirect owner of NSAL), and is a brother of Defendant Carlos Augusto Lopez.

19.     Defendant Carlos Augusto Lopez previously served as NSAL's Chief Commercial Officer (Shipping Division) and as a Director on NSAL's Board of Directors, in each case from January 3, 2008 until October 6, 2022. Defendant Carlos Lopez is a 33.3% owner of Sinimalec, and is a brother of Defendant Claudio Pablo Lopez.

## STATEMENT OF FACTS

20.     NSAL was incorporated on December 17, 2007, under the laws of RMI with Entity Number 27508 and is in good standing.

21.     NSAL was established through the business combination of Corporation Navios S.A. ("CNSA") and the Horamar Group ("Horamar").

22.     On January 1, 2008, pursuant to a share purchase agreement, Navios Holdings contributed: (a) $112.2 million in cash; and (b) the authorized capital stock of its wholly owned subsidiary CNSA in exchange for the issuance and delivery of 12,765 shares of NSAL, representing 63.8% of the outstanding stock of NSAL. NSAL acquired all ownership interests in

6

Horamar in exchange for: (a) $112.2 million in cash; and (b) the issuance of 7,235 shares of NSAL, representing 36.2% of the outstanding stock of NSAL. As a result, Navios Holdings owns 63.8% of NSAL, with the remaining 36.2% beneficially owned by Sinimalec through Peers, Defendants' and the Lopez Family's wholly owned holding company.

23.     Defendants were appointed to serve as Directors on NSAL's Board in January 2008. Defendants were also made executive officers of NSAL, with Defendant Claudio Lopez serving as NSAL's Chief Executive Officer and Defendant Carlos Lopez serving as NSAL's Chief Commercial Officer (Shipping Division).

24.     As Directors and officers of NSAL, Defendants owed NSAL fiduciary duties. As detailed below, rather than discharge those duties, Defendants engaged in a decade-long (at least) fraud against the Company, lining their and their family's own pockets with millions of dollars in misappropriated NSAL funds for their own benefit.

### The Fraudulent Invoices Scheme

25.     The Fraudulent Invoices Scheme began no later than 2013. By that time, Defendants had been serving as Directors and executive officers of NSAL for at least five years, and continued to serve in one or both of those positions until 2022 and 2024, respectively.

26.     In 2013, Defendant Carlos Lopez introduced Company employees to Co-Conspirator 1, a Paraguayan businessperson.

27.     Co-Conspirator 1 was secretly a "fixer" for Defendants, allowing them to perpetrate a massive theft of funds from the Company for the benefit of Defendants and the Lopez Family. Co-Conspirator 1 served as the focal point for the Fraudulent Invoices Scheme for several years, during which time Defendants and the Lopez Family extracted millions of dollars from the Company.

28.     As noted above, the Fraudulent Invoices Scheme had two components: forged invoices and fake invoices.   *Forged* invoices were otherwise legitimate vendor invoices that Defendants and their accomplices would instruct Company employees to alter to include fictitious goods or services, with the invoice amount adjusted to match whatever amount of money Defendants and the Lopez Family were looking to steal from the Company, plus a commission in the majority of invoices for the individuals who assisted in facilitating the scheme.

29.     *Fake* invoices were used primarily for three vendors (Vendor 1, Vendor 2, and Vendor 3, all discussed below), who generally received a monthly commission for allowing the use of their invoices for fictitious work, invoices against which the misappropriated payments to Defendants and their family were recorded.

30.     The Fraudulent Invoices Scheme generally took a similar form throughout the years.   At the direction and behest of Defendants, Company employees were instructed to make withdrawals of cash funds from Company money and to transfer these amounts to Defendants and other members of the Lopez Family, together with amounts to be paid to Co-Conspirator 1 for facilitating the payments.   To be clear, the payments demanded by Defendants were not for any legitimate corporate purpose; Defendants were simply looking to steal Company cash for their own personal use.

31.     In response to each payment demand, an employee from a Company subsidiary located in Paraguay would execute the payment by issuing a paper or electronic check to another employee at the same Company subsidiary in Paraguay.   This employee would then withdraw the amount in cash from the bank in Paraguay and deposit the cash with a money exchange in Paraguay.   Due to the size of the cash payments, Company employees would on occasion hire a

secured armored trucking company to transport the cash from the bank to the money exchange for safety purposes due to the sheer size of the cash involved.

32.     An employee at the money exchange would then facilitate the transfer of the payments to Defendants and other members of the Lopez Family for a fee.

33.     The fictitious invoices through which, at Defendants' direction and behest, the Fraudulent Invoices Scheme was carried out, generally attributed portions of the total payments reflected thereon to purported additional charges.  These supposed charges were actually not charges at all, but in practice instead functioned as inducements to Co-Conspirator 1 to carry out the Fraudulent Invoices Scheme and were made to Co-Conspirator 1 in cash.  When the conspiracy first started, these cash payments to Co-Conspirator 1 were generally between $30,000 to $40,000 per invoice.  In 2015, the payments to Co-Conspirator 1 increased significantly, with the largest payment being $80,000.

34.     For the cash payments to Co-Conspirator 1, either Co-Conspirator 1 or a family member thereof would visit the Company's offices in person to collect the cash.  Co-Conspirator 1 (or a member of his or her family) would on occasion sign a cash receipt.

35.     At the direction and behest of Defendants, Company employees were instructed to create fictitious accounting records to conceal the cash outflows.  When the cash payments were made to Co-Conspirator 1 in advance of a corresponding forged invoice, Company employees recorded the payments in the Company's accounting books as against "*a rendir caja*," *i.e.*, a cash advance; otherwise, the employees reflected a payment to the invoicing vendor.

36.     When a cash payment was made to Co-Conspirator 1 in advance of receiving a forged invoice, upon receipt of the forged invoice, a second payment of equal value would on occasion be paid to a Company employee acting at the behest of Defendants.  Funds from this

second payment would be returned to the bank within the same day or the following day, allowing the outstanding advance balance to be closed.

37.     To conceal the fraudulent payments, Co-Conspirator 1, at Defendants' direction, also organized the forgery of invoices from various third-party vendors.  These forged invoices originated as real invoices from vendors; however, at the direction and behest of Defendants, Company employees altered the invoices to provide for purported payments to the named vendor from the Company for goods or services that were never provided.

38.     The fraudulent invoices corresponded to Company cost centers (referred to by certain employees as "concepts") – including shipyard repairs and maintenance, software costs, administrative charges, and other expenses – that oftentimes had a predetermined artificially inflated budget, set by Defendants to facilitate the Fraudulent Invoices Scheme.

39.     In many instances, a Company employee, at the direction and behest of Defendants, would generate a fictitious Company purchase order ("PO") to create a paper trail for the forged invoice.

40.     Defendants then arranged for these phony POs and/or payments to be approved by associates of, and for various members of, the Lopez Family – almost always Defendant Carlos Lopez or Maria Lopez (Defendant Claudio Lopez's daughter and Defendant Carlos Lopez's niece).

41.     On at least two occasions, a Company employee unknowingly tasked with assisting in preparing a fictious PO reached out to the vendor listed on the PO to request the corresponding invoice.  This caused those vendors to become aware that their invoices were being forged.  As detailed below, at least one vendor threatened to alert the authorities to the fact that their company's name and invoices were being used in a fraudulent scheme, while at least two vendors

simply allowed Defendants to continue using fake invoices in their companies' names, in exchange for "commissions."

42.    Through a thorough and painstaking investigation, the Company has uncovered an enormous trove of documents exposing the Fraudulent Invoices Scheme, including forged and fake invoices, purchase orders, bank statements and receipts, and email and text message correspondence (including WhatsApp and other messages sent to and from Defendants or other members of the Lopez Family).  Beyond exposing the mechanics of the scheme itself, this documentary support – corroborated by information provided by several current and former Company employees – evidences the clear knowledge, participation, and orchestration of Defendants Claudio Lopez and Carlos Lopez (and other members of the Lopez Family) in the scheme.

43.    As just one example, one former Company employee ("Witness 1") confirmed that he or she once asked Defendant Carlos Lopez about the payments that Witness 1 was asked to facilitate for transfer to Buenos Aires through money exchanges.  Defendant Carlos Lopez replied: "*Hacelo*" (just do it).  Witness 1 understood that this was an order to stop asking questions and to just do as he or she was told.

44.    Similarly, another Company employee ("Witness 2"), who was uncomfortable with being asked to create supporting documentation for a fake invoice, at one point insisted that Defendant Claudio Lopez directly authorize him or her to do so, whereupon Claudio Lopez told the employee to just do as they were told and not to request approval from Claudio Lopez in the future.

45.    Witness 2 specifically remembers the very first time a Company employee asked Witness 2 to prepare language for a supporting document for a fake invoice.  As Witness 2 recalls,

this occurred at the Company office, and Witness 2 was sitting in a meeting room speaking with a supervisor. The supervisor told Witness 2 that Witness 2 needed to generate text to help prepare a fake invoice and that this task was approved by the Company. Witness 2 told the supervisor that Witness 2 first needed this request confirmed by Company senior management – specifically, Defendant Claudio Lopez – if Witness 2 were going to help prepare a fake invoice. The supervisor told Witness 2 that Witness 2 did not need to speak to Claudio Lopez, as the fake invoice and all related work to generate it were all authorized. But Witness 2 insisted that they were not going to prepare anything until they knew that Claudio Lopez knew about and approved the fake invoice project. In response, the supervisor told Witness 2 to wait in the meeting room. As Witness 2 recalls very clearly, Claudio Lopez then came into the meeting room looking very unhappy. Claudio Lopez told Witness 2 that Witness 2 was required to do all that the supervisor asked Witness 2 to do, and that Witness 2 was not to request Claudio Lopez's approval in the future. In response, Witness 2 told Claudio Lopez that he or she understood, and, that since Claudio Lopez knew about the fake invoice project and wanted Witness 2 to work on it, Witness 2 would do so. As Witness 2 understood things, that exchange with Claudio Lopez constituted Witness 2's "official instruction to go ahead" with supporting the creation of one or more fake invoices.

46.    Witness 2 also reports that, when asked via a February 26, 2020 WhatsApp message from his or her supervisor for fictitious documentation in support of a fraudulent invoice, the supervisor explained the reason for the request: "Cal [a reference to Defendant Carlos Lopez] está necesitando mosqueta" – in English: "Carlos needs money."

47.    Witness 2 further stated that, at the request of Witness 2's supervisor, on July 6, 2016, Witness 2 sent an email, copying Defendants Claudio Lopez and Carlos Lopez, among others, stating that Witness 2 would need to increase the Company's dry dock budget by $1.55

million, plus taxes, to accommodate various replacements of equipment for several of the Company's shipping vessels. As Witness 2 recalls, the purpose and effect of this email was to support an argument for increasing the Company's dry dock budget under the guise of fictitious repairs by Vendor 4. Witness 2, who is located in a country where English is not the primary language, wrote this email in English. Witness 2 remembers that, after sending this email and/or a related email also written in English, Witness 2 received a call from Defendant Claudio Lopez, who asked why Witness 2 had drafted the email in English. Witness 2 told Claudio Lopez that Witness 2 thought that the email might need to be forwarded to Greece , such that it would be better to write the email in English. Witness 2 recalls that Claudio Lopez was very angry with Witness 2 on that phone call and told Witness 2 that this dry dock budget increase was a local issue and had to be dealt with in Spanish. As Witness 2 specifically remembers, Witness 2 and everyone at the Company involved with this July 6, 2016 email knew that the purported shipping equipment repairs and replacements reflected in the email were completely fictitious and were just a pretext to facilitate further illicit payments to Defendants. Later in the day on July 6, 2016, Defendant Carlos Lopez replied to Witness 2's email with the words "ok," as did another Company employee who was a member of the Lopez Family. Over the next several months, Company employees, at Defendants' direction and behest, generated six fictitious invoices from Vendor 4, the total amount of which corresponded to the fake repair and replacement work that Witness 2 had outlined in their July 6, 2016 email.

48.     Another Company employee ("Witness 3") confirmed that, on October 11, 2022, after Navios Holdings representative Mr. George Achniotis became CEO of NSAL (replacing Defendant Claudio Lopez), one of Defendants' accomplices in the scheme instructed Witness 3 via WhatsApp not to discuss with "the Greeks" (*i.e.*, Navios Holdings) Vendor 1 or any other

"unholy arrangements." Witness 3 reports that they understood this instruction, which came from Witness 3's supervisor at the Company, to mean that Witness 3 must not mention to the Company's new management anything about the fake or forged invoices that Company employees had been facilitating at the direction and behest of Defendants. Witness 3 also understood this instruction as a warning not to disclose the involvement of Vendor 1 in this scheme. Witness 3's supervisor then forwarded that message to Witness 1 with the same instructions.

49.     Witness 1 subsequently received a message from Maria Lopez that information on vendors should not be passed on to the Company's new management.

50.     In total, and as detailed below, Defendants used no less than ten entities to perpetrate the Fraudulent Invoices Scheme, with Defendants ultimately embezzling at least approximately $8.2 million from the Company through this scheme alone, based on documents reviewed to date.

### a. Vendor 1

51.     Vendor 1, a consulting company, was one of the several Company vendors that Defendants used to carry out the Fraudulent Invoices Scheme.

52.     Vendor 1 was one of the first companies used by Defendants for fake invoices. The Lopez Family's connections with Vendor 1 allowed for prolonged use of Vendor 1's invoices as a means by which Defendants and other members of the Lopez family could steal funds from the Company, across several different Company "concepts."

53.     On September 30, 2015, Vendor 1 invoiced the Company for $439,109 (inclusive of charges), which was to be charged against a "Vegetable Oil Concept" at the Company. A check payment related to this invoice was issued for $397,000 on September 16, 2015, and was booked in the Company's accounting records as "*a rendir caja*" (a cash advance). This invoice was a

complete fabrication; no work was undertaken by Vendor 1 in connection with any "Vegetable Oil Project" at the Company.

54.     While the Company is still working to uncover the full extent of Defendants' fraud, it appears that the September 30, 2015 invoice was not the first fake invoice used to make payments for the benefit of Defendants and other members of the Lopez Family.  For example, internal Company communications from October 2014 show Defendant Carlos Lopez specifically instructing a Company employee to make a suspicious payment to Vendor 1.

55.     Between September 2015 and July 2020, the Company received and paid at least 10 sham invoices from Vendor 1, totaling no less than $1,323,406.80, plus at least an additional $124,301.61 for purported charges, as depicted below:

| Invoice no. | Invoice date | Concept listed on Invoice | Invoice amount including charges (USD) | Portion attributable to charges (USD) |
|---|---|---|---|---|
| 265 | Sept. 30, 2015 | Vegetable Oil | 439,109.00 | 43,910.90 |
| 481 | Apr. 23, 2018 | Valentina H (vessel) | 83,270.00 | 7,570.00 |
| 482 | Apr. 25, 2018 | Dr. Salgado H (vessel) | 83,270.00 | 7,570.00 |
| 483 | Apr. 30, 2018 | Enrico H (vessel) | 83,270.00 | 7,570.00 |
| 584 | July 15, 2019 | Fees & Brokerage | 145,142.80 | 13,194.80 |
| 604 | Aug. 28, 2019 | Fees & Brokerage | 71,984.00 | 6,544.00 |
| 611 | Oct. 4, 2019 | Fees & Brokerage | 24,926.00 | 2,266.00 |
| 612 | Oct. 9, 2019 | Fees & Brokerage | 99,704.00 | 9,064.00 |
| 648 | June 15, 2020 | Fees & Brokerage | 192,808.00 | 17,528.00 |
| 651 | July 14, 2020 | Fees & Brokerage | 99,923.00 | 9,083.91 |
| | | | **1,323,406.80** | **124,301.61** |

56.     In accordance with the practices described above, for each of these invoices, Defendants caused a check for the amount allocated to Defendants and the Lopez Family to be

issued in the name of a Company employee, who after receiving the check would then physically visit the Company's bank to cash the check. This Company employee would then deposit the amount at a money exchange, for onward transfer to Buenos Aires for the benefit of Defendants and other members of the Lopez Family. The purported charges portion of each invoice went to Co-Conspirator 1 or a member of his or her family, paid in cash at the Company's office.

57.    In exchange for Co-Conspirator 1's assistance with Defendants' use of fake invoices to facilitate Defendants' theft of Company assets, Defendants also arranged for Co-Conspirator 1 to receive out of Company funds a monthly fee that varied over time. On average, these fees consisted of a monthly payment of 14 million Guarani (equivalent to approximately $2,500). This monthly fee paid to Co-Conspirator 1 was separate from, and in addition to, the fees Co-Conspirator 1 received in connection with submitting forged invoices purportedly from other vendors (*i.e.*, the charges component of those fictitious invoices).

### b.  Vendor 5

58.    The Company received two invoices via Co-Conspirator 1 purportedly from Vendor 5 dated December 10, 2015 and January 11, 2016 – each for $200,000, plus $20,000 of supposed charges. Both invoices falsely indicated that they were for services related to "*despacho de control en linea compatible con el programa de control de volumen en tanques*" (online control dispatch compatible with the tank volume control program).

59.    An internal Company email from December 23, 2015 reflects that Defendants approved an increase in annual capital expense ("CAPEX") budget by $400,000 in anticipation of expected invoices in "December or January" 2015/2016. This $400,000 increase aligns precisely with the $400,000 non-charges total of the fabricated Vendor 5 invoices, and the December 23, 2015 email *post-dated* the date that appears on the first Vendor 5 invoice (December 10, 2015).

60.     In reality, the Company never received an invoice from Vendor 5 for legitimate goods or services rendered.  Rather, these invoices were forgeries prepared by or with Co-Conspirator 1 to facilitate the transfer of funds from the Company to Defendants and other members of the Lopez Family.

61.     Specifically, on January 13, 2016, a Company employee, acting at the direction and behest of Defendants, arranged a transfer of $340,000 in Company funds (in cash) to a Company employee, escorted by an armored truck company.  Defendants later caused cash transfers of $60,000 and $40,000 in Company funds to be made to that Company employee on January 15, 2016 and January 19, 2016, bringing the total amount transferred to $440,000 – the exact total of the two forged invoices from Vendor 5, including Co-Conspirator 1's cut.  The Company employee then deposited these funds, less Co-Conspirator 1's portion, in a money exchange for transfer to Buenos Aires for the benefit of Defendants and the Lopez Family.

### c.  Vendor 4

62.     Between July 2016 and November 2016, Defendants caused the Company to receive and approve for payment seven fabricated invoices supposedly from Vendor 4.  These sham invoices, sent via Co-Conspirator 1, totaled $1.577 million, plus an additional $157,700 of purported charges to account for Co-Conspirator 1's cut.

63.     The Vendor 4 invoices and associated payments promptly followed Defendant Claudio Lopez's approval, on or around July 6, 2016, of an increase in the Company's dry dock budget by $1.55 million, plus taxes (*i.e.*, substantially the  total of the seven Vendor 4 invoices).

64.     On the basis of these Vendor 4 invoices, Defendants caused $1.577 million in Company funds, corresponding to the value of the invoices excluding charges, to be misdirected for the benefit of Defendants and others within the Lopez Family, and caused the aggregate value

of the charges reflected on the invoices ($157,700) to be paid in cash out of Company funds to Co-Conspirator 1, consistent with the scheme described herein.

65.     At Defendants' direction and behest, Company employees prepared fictitious POs to correspond to the forged Vendor 4 invoices.

66.     In 2020, Defendants and their accomplices ordered an additional forged invoice from Vendor 4 to be created.  Incredibly, a Company technician preparing the PO, apparently unaware of Defendants' scheme, reached out to Vendor 4 requesting that Vendor 4 provide the corresponding invoice for the PO.  This alerted Vendor 4 that a forged invoice was being created in its name.  Vendor 4 subsequently requested that the Company provide a copy of the invoice so that Vendor 4 could report the forgery to the relevant authorities.  In response, a Company employee, operating at the direction of and for the benefit of Defendants, told Vendor 4 that there had been a mistake, and that no such invoice had been received or ever existed.

67.     However, Defendants had already caused the Company to make a "payment" in respect of this 2020 forged Vendor 4 invoice, and had already caused the corresponding funds to be diverted to Defendants and the Lopez Family.  As such, Defendants needed a replacement forged invoice in order to conceal the illicit payment that they had taken from the Company. Defendants accordingly directly or indirectly commissioned another company, Vendor 11 (discussed in detail below), to issue a replacement forged invoice.

### d.  Vendor 6

68.     Between March and May 2016, Defendants caused the Company to make payments on three forged invoices from Vendor 6, relating to purported ship and vessel maintenance and repairs.  These fabricated invoices totaled $852,500 and included $77,500 of supposed additional

charges.  The entirety of these Company funds went to Defendants, the Lopez Family, and their co-conspirators.

69.     Between March 31, 2016 and May 4, 2016, Defendants caused three cash advances to be made out of Company funds to Co-Conspirator 1 in consideration for Co-Conspirator 1's facilitation of Defendants' fraud.  These cash advances totaled $77,500 – equal to the aggregate value of the supposed additional charge amounts across the three forged Vendor 6 invoices. Defendants caused each advance to be recorded in the Company's accounting system as a cash advance.  To close out the previous "*a rendir caja*" advances to Co-Conspirator 1, Defendants caused an additional withdrawal of $77,500 be made from the Company's bank (on June 10, 2016) and redeposited into the same account (three days later).

70.     Between April 8, 2016 and May 10, 2016, Defendants caused Company employees to make three Company checks out to Co-Conspirator 1, totaling $852,500 (the precise value of the forged Vendor 6 invoices, including extra charges).

71.     Co-Conspirator 1 then cashed these Company checks and deposited the proceeds into a money exchange for onward transfer to Defendants and the Lopez Family.

### e.  Vendor 7

72.     Between February and September 2017, Defendants caused the Company to make payment on seven forged invoices from Vendor 7 – a provider of barge repair and maintenance services.  These counterfeit invoices totaled $2.17 million, inclusive of $197,000 in additional charges.  For each of these seven forged invoices, a Company employee created the corresponding PO.

73.     Defendants diverted the entire $2.17 million in Company funds represented by payment on these fake invoices to themselves, other members of the Lopez Family, and their co-conspirators.

74.     Specifically, Defendants caused the full $2.17 million invoice value to be paid to a Company employee, who subsequently deposited the net portion in a money exchange for the benefit of Defendants and the Lopez Family.  The remaining $197,000 charges portion was paid to Co-Conspirator 1 via checks made out to a Company employee, who cashed them and provided the funds to Co-Conspirator 1 (or a member of his or her family).

### f.   Vendor 8

75.     In November 2016, Defendants used two forged invoices created by or with Co-Conspirator 1 for Vendor 8 to defraud the Company of $519,629.

76.      The first invoice, dated November 2, 2016 and designated for the concept "Ponton MF03" was for $259,814.50.  The second invoice, dated November 15, 2016, was also for $259,814.50.

77.     Defendants caused the Company to issue payments purportedly in respect of these manufactured invoices on November 2, 2016 and November 18, 2016, each in the amount of $259,814.50.  Company emails dated November 2, 2016 and November 17, 2016 detail arrangements for armored trucks to collect the funds in cash from the Company's bank with a Company employee, and then to deliver the funds to a money exchange, all of which was for the improper benefit of Defendants and the Lopez Family and at the expense of the Company.

### g.   Vendor 9 and Vendor 10

78.     In October 2017, Defendants caused the Company to receive, and to make payments in respect of, two forged invoices supposedly from Vendor 9, a naval engineering

company, for the purported repair of two shipping vessels.  These invoices totaled $469,589, inclusive of $42,689 of charges.

79.    Similar to what transpired in connection with the forged Vendor 4 invoice in 2020, a Company technician preparing the corresponding Vendor 9 PO (but unaware that he or she was tasked with preparing a fictitious PO) reached out to Vendor 9 requesting information regarding the invoice, thus alerting Vendor 9 to the existence of the forgery.  However, unlike Vendor 4, Vendor 9 was willing to "play ball" in Defendants' fraudulent scheme – provided that they got a cut of the action.

80.    Upon learning of the mishap with Vendor 9, Defendant Claudio Lopez called Witness 1 and told him or her to solve the issue in whatever manner possible.  Shortly thereafter, an employee of the Company, acting at the direction and behest of Defendants, flew out to meet the owners of Vendor 9.  At that meeting, the parties reached an illicit agreement whereby the forged Vendor 9 invoices would be replaced by fake invoices provided by Vendor 10, owned by Vendor 9.  In exchange for their support in the fraud, Vendor 9's owners would receive a fee for these fake invoices.

81.    In November 2017, the Company received two new invoices from Vendor 10, totaling $443,310, including charges of $40,301, for purported repairs to the same shipping vessels as the October 2017 Vendor 9 invoices.

82.    Defendants then caused the Company to transfer the funds represented by these fabricated invoices to Defendants and the Lopez family (and Co-Conspirator 1) in accordance with the scheme discussed herein.

### h.  Vendor 11

83.     As detailed in Paragraphs 66 and 67 above, once Vendor 4 became aware of the 2020 forged invoice, Defendants had to come up with a replacement fake invoice for bookkeeping purposes, as Defendants had already diverted the corresponding funds out of the Company to themselves and the Lopez Family.

84.     Defendants engaged Vendor 11, an existing Company vendor, to fill this gap.  And, similar to Vendor 9, Vendor 11 agreed to supply fake invoices for Defendants.

85.     Between November 2019 and January 2022, the Company received six invoices from Vendor 11, totaling $494,757.  These invoices related to purported structure and hull repair on five different barges.

86.     The two largest Vendor 11 invoices – which totaled $469,480 including charges (or 95% of the total value of all known Vendor 11 invoices) – were fabricated invoices.  A significant portion of the payments out of the Company purportedly in satisfaction of these two invoices pre-dated both the corresponding POs and the invoices themselves.

87.     Defendants took (*i.e.*, stole) the Company funds associated with these fraudulent invoices for themselves and other members of the Lopez Family (and Co-Conspirator 1).

### i.  Vendor 2, Vendor 3, and Vendor 12

88.     In late 2020 or early 2021, various Company employees began raising concerns regarding Co-Conspirator 1.  In particular, these concerns related to the forged Vendor 4 invoice incident (*see supra* Paragraphs 66 and 67).

89.     Given that Defendants' demands for fraudulent cash payments out of Company funds were continuing, Defendants then needed to identify new accomplices to generate fictitious invoices.

90.     At Defendants' direction and behest, two replacement companies were identified that would furnish the fabricated invoices necessary to perpetuate Defendants' fraud: Vendor 2 for commercial expenses such as administrative expenses and brokerage fees, as contemporaneously confirmed by a Company employee in WhatsApp messages; and Vendor 3 for operational expenses.

91.     Unlike the previous scheme run through Co-Conspirator 1, which centered around *forged* invoices of real companies, Vendor 2 and Vendor 3 would provide the Company with *fake* invoices for their own fictitious work, against which payments would be made for Defendants and the Lopez Family as the beneficiaries.

92.     From August 2021 forward, Defendants caused Vendor 2 to issue at least four invoices that have already been identified as fake, totaling $331,100 (including charges).  The scope of work on these invoices were vaguely described as "expenses" relating to vessels in which the Company had interests.

93.     In reality, Defendants caused the payments associated with these four invoices to be made via checks to a Company employee, with the non-charges portions being paid well in advance of the invoice dates – in one case, *eighteen months* in advance, as reflected below:

| Inv. No | Invoice Date | Invoice amount excl. charges | Payment Date | Payment amount (USD) | Payment method |
|---------|--------------|------------------------------|--------------|----------------------|----------------|
| 64      | Dec. 30, 2021 | 90,000.00                   | July 21, 2020 | 89,384.00           | Check          |
| 157     | Dec. 29, 2022 | 100,000.00                  | Jun. 24, 2022 | 100,000.00          | Check          |
| 158     | Dec. 29, 2022 | 56,000.00                   | Aug.11, 2022  | 56,000.00           | Check          |
| 159     | Dec. 29, 2022 | 55,000.00                   | July 25, 2022 | 55,000.00           | Check          |

94.     Defendants caused the Company funds associated with "payment" of these fake invoices to be diverted to Defendants and the Lopez Family in accordance with the scheme described herein.

95.     Vendor 3 was the other entity Defendants used to replace Co-Conspirator 1.  The owner of Vendor 3 originally had a legitimate sole proprietorship that did business with the Company.  However, since the value of the planned fraudulent payments and related invoices would be much higher than would be expected of a single owner company (and would therefore raise questions in the eyes of the tax authorities), Defendants asked the owner of Vendor 3 to create a new company that would purportedly justify the value of the fraudulent invoices being created. In response, the owner of Vendor 3 created Vendor 12, a new company with a similar name.

96.     To date, at least one fake invoice for $205,150, paid by the Company in or around September 2021, has been connected to Vendor 12.

97.     For Vendor 3's participation in the scheme, Defendants caused the Company to pay Vendor 3 a monthly fee of $1,000.

98.     In all, based on the Company's investigation to date, the Fraudulent Invoices Scheme resulted in Defendants looting at least approximately $8.2 million from the Company as described herein, with numerous additional invoices that still remain to be reviewed, vetted, and authenticated.

**<u>Bunker Fuel Scheme</u>**

99.     Defendants also authorized and enabled Maria Lopez to use her position within the Company as a director, officer, and fuel trader at the relevant operating subsidiary to funnel confidential information about the Company's bunker fuel suppliers' bids to her husband Martin Javier Cini ("Cini"), a director of Copsa Combustibles, Quimicos Y Especialidades SA

("Copsa")—a bunker fuel supply company that is owned by Cini's family and was a supplier to the Company.  Cini then used this confidential information to undercut bids for Company contracts by competing fuel supply companies and, with Defendants' support, to secure U.S.-dollar denominated fuel supply contracts worth $11,420,326 with the Company.  Copsa worked closely with and used a "separate" petrochemical and fuel company, Pentyum International Co. ("Pentyum"), to invoice the Company and carry out bunker fuel trades.  It seems Pentyum was set up precisely to accommodate this scheme, as the invoice numbers are all sequential and all relate to the Company's bunker supplies.

100.    Defendants regularly exploited their positions of power within the Company to assist Maria Lopez in corruptly steering the Company's fuel supply contracts toward Cini and Copsa, improperly diverting millions of dollars in Company funds to the Lopez Family (specifically, Maria Lopez's family).  The services provided by Copsa to the Company pursuant to these contracts were substandard, and Company employees constantly complained about issues and problems with the provision of Copsa's services, including late shipments.  In addition, because the contracts awarded to Copsa in Argentina were denominated in U.S. dollars, as a result of Defendants' and Maria Lopez's misconduct, Copsa benefited by millions of dollars following changes in the peso-dollar exchange rate – benefits Copsa otherwise would not have had pursuant to a standard, arm's-length competitive bidding process.  Through their approval and facilitation of the Bunker Fuel Scheme, Defendants substantially harmed the Company in order to further the interests of the Lopez Family.

### a.  Extreme Preferential Treatment of Copsa

101.    Beginning in 2014 if not earlier, Defendants caused Copsa to received preferential treatment over other bunker fuel suppliers, including by authorizing and enabling Maria Lopez's

leakage to Copsa of confidential insider information regarding the bids of other Company suppliers, by permitting Copsa (based on that leaked information) to revise its quotes to match or come in lower than the lowest quotes by its competitors, and by forcing the Company into contracts with Copsa despite it offering subpar services.

102.    In March 2014, as authorized and enabled by Defendants, Maria Lopez requested that Copsa be registered as a Company supplier for bunker fuel services, naming Cini as the point of contact for Copsa, and specifically demanding that the Company "give him priority with the quotes."

103.    Defendant Carlos Lopez was aware of Cini's connection to Copsa and expressed enthusiasm to facilitate contracts between the Company and Copsa.  On August 4, 2020, a Company employee requested authorization from Defendant Carlos Lopez and Maria Lopez to purchase fuel from Copsa and provided the quoted prices of four suppliers, with Copsa (after being fed its competitors' quote information and being thereby enabled to revise its own quote) offering the lowest quote.  Defendant Carlos Lopez responded, "how great COPSA at 439!" dollars a unit; he then approved the transaction between the Company and Copsa.  This pattern continued.  On July 7, 2020, when a Company employee requested a similar authorization after Copsa matched the price of another company, Defendant Carlos Lopez responded: "[O]f course when it's equal, Copsa," confirming that Copsa should be given preferential treatment.[1]  As described in detail below, Copsa routinely came in with the lowest bid (or matched the lowest bid) for the Company's

---

[1] Likewise, Defendant Claudio Lopez was aware of, approved of, and enabled the preferential treatment given to Copsa in light of Maria Lopez's connection to Cini and Copsa.  In October 2020, Defendant Carlos Lopez shared an email with Defendant Claudio Lopez regarding fuel quotes from Copsa and two other companies, and he commented, "[O]f course I want to buy from Martin [Cini]."

bunker fuel supply contracts, due to the confidential insider information that was impermissibly provided to Copsa by Maria Lopez, with the knowledge, support, and endorsement of Defendants.

104.    That Copsa – on the back of inappropriately obtaining confidential competitor information – was able to bid lower than other companies was not a benefit to the Company – quite the opposite, in fact.  The Company's policy and general practice was to use a competitive bidding process to secure the fuel necessary for the Company's operations, whereby multiple fuel suppliers would submit competing bids.  Defendants' support and endorsement of Maria Lopez feeding confidential information to her husband's company was an absolute corruption of the integrity of the Company's bidding process, which in itself was a short- and long-term harm to the Company. For example, as detailed below, Copsa provided the Company sub-par services, including late shipments of critically necessary fuel, the absence of which damaged Company operations.  As an additional example, and as again detailed further below, Copsa used its favored status to secure preferential contract terms, including insulation from the devaluation of Argentina's currency that produced millions of dollars in value for Copsa.

105.    Maria Lopez's practice of sharing with Copsa insider information regarding bunker fuel quotes from other suppliers, thus allowing Copsa to adjust its bids to undercut the competition, was not intermittent or occasional.  To the contrary, with Defendants' knowledge, support, and endorsement, Maria Lopez consistently forwarded to Cini and other employees at Copsa internal Company emails containing information from competitors regarding fuel quotes, thus allowing Copsa to improve its quotes and secure the Company's contracts.

106.    As early as at least March 2014, Maria Lopez had a practice of forwarding internal confidential Company emails to Cini containing supplier quotes.  This began what would become

27

a continuing practice whereby Maria Lopez would share insider information with Cini. Defendants were aware of and approved this practice.

107.    On April 9, 2015, Maria Lopez requested from a Company employee a spreadsheet of bunker fuel supplier quotes, which she then forwarded to Cini.

108.    On September 8, 2015, a Copsa employee emailed Maria Lopez requesting information on the Company's bunker fuel suppliers' quotes, so that Copsa could understand how its pricing compared to its competitors' pricing. Maria directed Company employees to pass this information along to the Copsa employee.

109.    On October 24, 2019, after the Company received quotes from Copsa and two other suppliers, one of which had the same base price as Copsa but reflected fewer additional expenses, Maria Lopez forwarded the quotes to Cini, asking him if Copsa could match the lower expenses reflected in the competitor's quote, which Cini admitted Copsa could not do.

110.    This practice of Copsa receiving information regarding competitors' quotes was a privilege bestowed only on Copsa. All other suppliers sent in their bids for contracts without any indication of whether their quotes were high or low compared to their competitors. Defendants knew of, authorized, and enabled this preferential treatment of Copsa.

111.    On May 11, 2020, Maria Lopez and Defendant Carlos Lopez received bunker fuel supply quotes from Copsa and two other suppliers – two large multinational oil majors. Maria Lopez, Defendant Carlos Lopez, and Defendant Claudio Lopez then corresponded by email regarding these competing quotes. Defendant Carlos Lopez wrote, "Get those from Copsa to lower their price," to which Maria Lopez responded, "hahaha it's a lot of effort to beat [the oil majors]." In other words, Defendants and Maria Lopez had by 2020 been so successful in converting the Company's bunker fuel bidding process into a complete sham for the benefit of Copsa and the

Lopez Family that the bid-rigging process was now child's play and something to joke about amongst themselves.

112.    As a result, Copsa was routinely able to undercut or match the bids of its competitors, which was possible only because of the insider information improperly shared with Copsa by Maria Lopez, with the knowledge, support, and endorsement of Defendants.

113.    On June 2, 2020, after a Company employee sent quotes of three suppliers (including Copsa) to Maria Lopez and Defendant Carlos Lopez, Maria Lopez requested more information regarding the quotes, including a summary of relevant vessels and capacity.  She then forwarded this entire conversation to Cini.  Copsa was then able to improve its quote from $470.00 per unit to $455.00 per unit, matching the price of a competitor supplier and winning the Company contract.

114.    Likewise, on April 8, 2021, a Company employee reported to Maria Lopez that Copsa had quoted the Company $495.00 a unit and that a competing supplier had quoted $485.00 a unit.  Like clockwork, Maria Lopez later that same day responded to the Company employee that Copsa had updated its bid to match the price of the competitor, and that the contract was being awarded to Copsa.

115.    Defendants were aware of, approved of, and endorsed this sweetheart treatment of Copsa, which Defendants caused to be afforded Copsa due to (a) Maria Lopez's relationship with Cini and (b) Defendants' interest in enriching, at the expense of the Company, themselves and other members of the Lopez Family – including Maria Lopez, who was also one of their loyal enablers and protectors in connection with the Fraudulent Invoices Scheme.

116.    Unfortunately, for the Company, Copsa's services have been consistently and extraordinarily substandard, and have generated problems for, and complaints by, certain

Company employees who were unaware of the preferential treatment being afforded to Copsa with the knowledge and approval of Defendants.

117.    Problems with Copsa's services began as early as December 2014.  At that time, the Company reported to Copsa that Copsa's lower quality services had "generated commercial problems, internal coordination problems and increased costs in the operation."  As a result, the Company ultimately had to ship critically necessary fuel using a different supplier, generating additional expenses for the Company.

118.    Despite these disruptive, costly, and highly suspicious service and delivery failures, Copsa continued to be the preferred bunker fuel supplier for the Company – a function of nothing but (a) Maria Lopez's relationship to Copsa through her husband and (b) Defendants' obsession with enriching themselves and other members of the Lopez Family at the Company's expense.

**b. Company Losses Due to Copsa's Preferential Exchange Rate Treatment**

119.    In addition to the losses stemming from the Bunker Fuel Scheme described above, the Company was exposed to further losses due to Defendants' preferential treatment of Copsa in awarding it contracts denominated in U.S. dollars.

120.    The Company's payment arrangement with Copsa created the potential for Copsa to benefit enormously on the one hand, and for the Company to experience significant opportunity losses and damages on the other, over the period from 2021 onwards.  This is exactly what happened.

121.    Because Copsa received payment from the Company in USD rather than ARS, as the value of ARS declined substantially in comparison to USD (which was entirely foreseeable given macroeconomic factors and precedents), Copsa was benefited by the ARS and USD exchange rates.  Copsa was receiving the benefit of ARS volatility by having the option to pay the

end supplier (who supplied Pentyum) in local currency rather than USD.  The Company lost out in the form of squandered cost-savings that the Company could have enjoyed had it been given the opportunity to negotiate competitive positions directly with end suppliers, as would have occurred but for Copsa's sweetheart status.  Defendants were aware of, endorsed, facilitated, and enabled this cost-shifting structure, and are responsible for the resulting benefit to Copsa and harm to the Company.

122.    All improper conduct associated with the Bunker Fuel Scheme is properly attributable to Defendants, both because of their direct involvement in the scheme and because of their knowledge, support, facilitation, endorsement, and approval of Maria Lopez's actions in support of the Bunker Fuel Scheme.

### Personal Piggybank Scheme

123.    Apparently not satisfied with ripping the Company off to the tune of millions of dollars through the Fraudulent Invoices Scheme and the Bunker Fuel Scheme, Defendants (and other members of the Lopez Family) also used the Company as their personal piggybank, misappropriating corporate funds for numerous luxury personal items having nothing to do with Company business, including cigars, expenses for personal travel on private planes, and equestrian equipment.

124.    Specifically, from 2015 forward, Defendants directed Company employees to use Company funds to pay for personal items for Defendants (and for other members of the Lopez Family) or simply to provide Defendants and other members of the Lopez family with cash, which Defendants and the Lopezes then used to purchase personal items.

125.    The Personal Piggybank Scheme was well documented.

126.    The earliest available documentation from March 2016 details the use of Company funds for (i) purchases of various cigars for Defendant Carlos Lopez, in a total amount of $1,276.00; and (ii) payments totaling $6,526.00 for the personal credit card of Defendants' brother, the late Horacio Lopez.

127.    This pattern continued and worsened: as of January 2017, documentation details similar use of Company funds for the personal expenses of the Lopez Family, notably including (i) additional purchases of cigars for $3,658.00 and (ii) payments on the credit cards of Defendants Claudio and Carlos Lopez (and their brother, Horacio Lopez) totaling USD $11,342.00 and PYG 75,000.

128.    In addition, over the years, Company employees – acting at the direction of Defendants – used Company funds to pay for domestic appliances/household items, customs duties on products shipped to the Lopez Family, and personal travel expenses wholly unconnected to business activities.  These expenditures were recorded in the Company's accounting system as "office expenses."

129.    As one particularly egregious example, Defendants caused Company funds to be used in June of 2017 to purchase for, and ship to, Maria Lopez a specialty washing machine designed to launder large horse blankets and a dryer.

130.    Likewise, Defendants and various Lopez Family members regularly used Company credit cards for their own personal use.  Since 2015, Defendants and Maria Lopez generated the majority of the expenses on seventeen Company credit cards.  A  portion of those charges had nothing to do with Company business, and in reality, constituted Defendants enriching themselves and the Lopez Family at the Company's expense.

131.    By way of example, Defendants charged to their Company cards personal hotel and airline expenses, amounting to at least 16 million ARS and $73,000 in charges that are currently under review.  To take a snapshot of just one month (February 2020), Defendants and other members of the Lopez Family expensed over $5,000 to Company-issued credit cards for personal travel to the United States, Maria Lopez (with the authorization and endorsement of Defendants) expensed to the Company $1,177 for personal appliances.

132.    Defendants additionally used Company funds to pay for expenses for their private airplane.  In particular, Defendants own and control DiviJet SA, through which they own a private jet.  Defendants invoiced charges to the Company for DiviJet.

133.    While the Company's investigation is still ongoing, a partial summary of the impermissible personal expenses that Defendants imposed on the Company through the Personal Piggybank Scheme follows:

| Date | Recipient | Personal Expense | Cost |
|------|-----------|------------------|------|
| November 17, 2015 – January 22, 2016 | Defendant Carlos Lopez | Cigars | $1,276 USD |
| February 11, 2016 | Horacio Lopez | Credit card payment | $6,526 USD |
| February 11, 2016 – December 29, 2016 | Defendants and Horacio Lopez | Credit card payments | $11,342 USD 75,000 PYG |
| October 20, 2016 – November 17, 2016 | Defendant Carlos Lopez | Cigars | $3,658 USD |
| June 28, 2017 | Maria Lopez | Washing machine for horse blankets. Clothes dryer | $1,001.55 |
| February 14 to 22, 2020 | Defendant Claudio Lopez and Maria Lopez (and family) | Travel expenses | $5,054.37 USD |
| April/August 2020 | Maria Lopez | Robot vacuum cleaners | $513.23 and $816.34 |
| 2015 onwards | Defendants and Maria Lopez | Credit card transactions | Up to $1.7 million USD |
| Various | Defendants | Hotel and airline expenses | 15 million ARS $73,000 USD |
| Various | Defendants | DiviJet expenses | $89,384 USD |

134.    Defendants never repaid or caused to be repaid to the Company any of the funds misappropriated through the Personal Piggybank Scheme.

135.    All improper conduct associated with the Personal Piggybank Scheme is properly attributable to Defendants, both because of their direct involvement in the scheme and because of their knowledge, support, facilitation, endorsement, and approval of all other actions in support of the scheme.

## Tolling of Statutes of Limitations

136.    As alleged herein, Defendants and their accomplices affirmatively presented forged invoices and purchase orders that were paid out by the Company (unknowingly) for the benefit of Defendants and the Lopez Family, and further acted to conceal the true purpose of these payments.

137.    Defendants and their accomplices hid their bid rigging in favor of Copsa by concealing from NSAL the leakage of insider information to Copsa, such that Copsa's bids appeared to be legitimate.

138.    Defendants purported to use Company funds for legitimate purposes and recorded their purchase of luxury personal items as "office expenses" and other ostensibly permissible uses of Company funds, in order to disguise their raiding of Company coffers for personal expenses.

139.    Defendants took numerous other active steps to fraudulently conceal their schemes from NSAL.  For example, in October 2022, once George Achniotis became CEO of NSAL, Company employees were instructed by Defendants and their accomplices not to discuss Vendor 1 or any other "unholy arrangements" with "the Greeks," referring to new Company management.

140.    NSAL had no information regarding the forged invoices, the preferential treatment of Copsa, the use of Company funds for personal expenses, or any of the other wrongful conduct

alleged herein.  Nor could NSAL have uncovered such information in the exercise of reasonable diligence.

141.    To the contrary, NSAL could not have discovered the truth regarding Defendants' fraudulent schemes because Defendants actively and fraudulently concealed information from NSAL that was necessary to understand the facts underlying the various schemes.

142.    For example, Defendants, by virtue of their positions as NSAL Directors and senior officers, had intimate knowledge regarding the Company's accounting controls and audit policies and practices.  Defendants thus purposefully conducted their misconduct in a manner that would avoid detection by the Company's controls and audit procedures, which further explains how Defendants were able to perpetuate their schemes for so long before discovery by NSAL.

143.    Defendants also knew that NSAL would rely on the documentation that Defendants submitted or had submitted on their behalf, including forged invoices and purchase orders, budgets, quotes and invoices from Copsa, and expenses charged as "office expenses" and other ostensibly legitimate uses, and NSAL relied on Defendants to report this documentation truthfully and accurately.

144.    By knowingly and intentionally directing, authorizing, and reporting forged invoices and purchase orders, corrupt quotes and invoices from Copsa, and expenses falsely charged as "office expenses" and other apparently legitimate uses, knowing at all times that NSAL would reasonably rely on the face of this documentation to NSAL's detriment, Defendants misled NSAL and thereby obtained millions of dollars to which they were not entitled.

145.    Defendants intentionally concealed the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, the Personal Piggybank Scheme, and all other wrongful conduct alleged herein, and as a result NSAL could not have uncovered Defendants' wrongdoing prior to now.

146.     Only in the spring of 2024 did new management at the Company first begin to glean hints of potential wrongdoing that may have occurred during Defendants' tenure as Directors and senior executives at NSAL.   The Company's new management team immediately set about reviewing past practices at the Company.   Within a few months, by the summer of 2024, it became apparent that serious, alarming defalcations of duty by Defendants might have occurred during Defendants' tenure as Directors and senior executives at NSAL.  New management then promptly engaged a leading law firm (based in Europe), which in turn engaged a globally-leading investigative firm, with further assistance from a globally-leading accounting firm, to forensically examine the Company's books and records.  Those firms moved with all due care and diligence. Only now can this lawsuit be brought with all due alacrity at the earliest moment wherein NSAL can responsibly assert the serious allegations and claims made herein.

147.     Accordingly, and as a result of Defendants' fraudulent concealment, the running of any statutes of limitations has been tolled with respect to all and any claims brought by NSAL as a result of the unlawful conduct alleged in this Complaint.

## CLAIMS FOR RELIEF

Plaintiff states these claims for relief against Defendants on a joint and several liability basis.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Loyalty

148.     Plaintiff incorporates by reference the above paragraphs as if fully stated here.

149.     As Directors and officers of NSAL during the relevant period, Defendants Claudio Lopez and Carlos Lopez owed a fiduciary duty of undivided loyalty to NSAL.

150.     This duty required Defendants to act in the best interests of NSAL, placing the interests of NSAL and its shareholders before their personal interests.

36

151.     Defendants Claudio Lopez and Carlos Lopez violated this duty by, among other things, unfairly, fraudulently, and/or wrongfully (i) orchestrating and perpetrating the Fraudulent Invoices Scheme to misappropriate millions of dollars from NSAL; (ii) facilitating and approving the Bunker Fuel Scheme to the Company's detriment; and (iii) using the Company's petty cash accounts and credit accounts to pay for Defendants' and the Lopez Family's extensive personal expenses in furtherance of the Personal Piggybank Scheme.

152.     Defendants' breaches have caused and are continuing to cause NSAL substantial harm, including but not limited to, millions of dollars in misappropriated funds and damage to NSAL's goodwill.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty of Good Faith

153.     Plaintiff incorporates by reference the above paragraphs as if fully stated here.

154.     As Directors and officers of NSAL during the relevant period, Defendants Claudio Lopez and Carlos Lopez owed a fiduciary duty of good faith to NSAL.

155.     This duty required Defendants to act honestly, in the best interests of NSAL, and in a manner that is not knowingly unlawful or contrary to public policy.

156.     Defendants Claudio Lopez and Carlos Lopez violated this duty by, among other things, unfairly, fraudulently, and/or wrongfully (i) orchestrating and perpetrating the Fraudulent Invoices Scheme to misappropriate millions of dollars from NSAL; (ii) facilitating and approving the Bunker Fuel Scheme to the Company's detriment; and (iii) using the Company's petty cash accounts and credit accounts to pay for Defendants' and the Lopez Family's extensive personal expenses in furtherance of the Personal Piggybank Scheme.

157.     By orchestrating and perpetrating the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme, Defendants intentionally acted with a purpose to

benefit the pecuniary interests of themselves and the Lopez Family, at the expense of the interests of NSAL.

### THIRD CAUSE OF ACTION

**Fraud**

158.    Plaintiff incorporates by reference the above paragraphs as if fully stated here.

159.    Defendants intentionally misrepresented and concealed facts to NSAL through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme described herein.

160.    Specifically, Defendants—both directly and through their agents—directed various employees at the Company to create and submit forged and fake invoices for payment by the Company.  At Defendants' direction and behest, these employees would then arrange for payments of these forged and fake invoices by the Company, which would then be converted to cash and transported to money exchanges, whereupon those funds would be paid for Defendants' and the Lopez Family's benefit and for the benefit of Defendants' co-conspirators.

161.    Defendants also facilitated the Bunker Fuel Scheme and the Personal Piggybank Scheme.

162.    Defendants concealed the Fraudulent Invoices Scheme from NSAL through intentional misrepresentation by instructing—both directly and through their agents—Company employees to record the fake invoices in the Company's accounting records and to create further documentation, such as fraudulent POs, to legitimize the fraudulent transactions.  Defendants instructed the employees being used to facilitate the scheme not to discuss any of these transactions with NSAL's majority shareholder, Navios Holdings, or its employees.  Defendants also concealed the Bunker Fuel Scheme and the Personal Piggybank Scheme.

163.    NSAL was unaware of the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, or the Personal Piggybank Scheme because NSAL reasonably relied on various Company records, including numerous documents that at first glance appeared to be legitimate but were actually forged invoices and fraudulent accounting records created by Defendants (and others acting at Defendants' direction) in order to conceal the fraudulent schemes.

164.    Defendants' intentional misrepresentations and concealments were made with intent to defraud NSAL.

165.    NSAL's reliance on these fraudulent misrepresentations caused direct, proximate, and foreseeable harm and damages to NSAL in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Conversion

166.    Plaintiff incorporates by reference the above paragraphs as if fully stated here.

167.    Defendants' wrongful conduct and actions against NSAL constitute conversion under applicable law.  Specifically, Defendants have intentionally and impermissibly stolen, taken possession of, converted, and wrongfully exercised dominion over NSAL's funds through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme described herein.

168.    At the time of the conversion, NSAL owned these funds, and it had the sole and exclusive right to determine to whom to issue monies from its business bank account.

169.    NSAL, through its Company subsidiaries, issued payments to Defendants and members of the Lopez Family as a result of the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme.

170.    Defendants actively participated in these schemes and knew that (i) the relevant invoices were either fake or fraudulent when paid by the Company, with the money ultimately

being paid for the benefit of Defendants and the Lopez Family; (ii) Maria Lopez was funneling confidential information about the Company's bunker fuel suppliers to Copsa so that Copsa could undercut bids for Company contracts and secure U.S.-dollar denominated fuel supply contracts with the Company; and (iii) NSAL funds were being used to pay for Defendants' (or members of the Lopez Family's) personal expenses.

171.    Defendants substantially interfered with NSAL's property by intentionally taking NSAL's monies for their personal use.

172.    NSAL did not consent to Defendants' taking of its monies.

173.    As a direct and proximate result of Defendants' conversion, NSAL suffered actual damages, the amount of which will be proven at trial.

## FIFTH CAUSE OF ACTION

### Civil Conspiracy

174.    Plaintiff incorporates by reference the above paragraphs as if fully stated here.

175.    Defendants, along with Co-Conspirator 1 and several other unnamed co-conspirators, constitute a confederation or combination of two or more persons.

176.    Defendants, along with Co-Conspirator 1 and several other unnamed co-conspirators, entered into one or more express or tacit agreements to achieve an unlawful end: namely, misappropriating millions of dollars in NSAL funds for their own benefit through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme.

177.    Defendants' wrongful conduct as described herein was performed and done in furtherance of the conspiracy to defraud and steal from NSAL for the benefit of themselves, other members of the Lopez Family, and their co-conspirators.  Specifically, Defendants breached their fiduciary duties of loyalty and good faith, fraudulently misrepresented and concealed facts to

NSAL, and unlawfully converted NSAL funds, in each case through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme.

178.    In furtherance of their unlawful conspiracy, Defendants orchestrated the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme by way of, including but not limited to, Defendants' introduction of Co-Conspirator 1 to Company employees (thus allowing Co-Conspirator 1 to effectuate the Fraudulent Invoices Scheme for several years), Defendants' approval and awareness of fictitious budget increases to conceal the Fraudulent Invoices Scheme, Defendants' orchestration of the processes used to effectuate the various schemes, Defendants' approval and awareness of Maria Lopez's leaking of confidential insider information to Copsa so that Copsa received preferential treatment, Defendants' requests for payment of personal expenses from NSAL funds pursuant to the Personal Piggybank Scheme, and Defendants directly benefiting from the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme.

179.    As a direct and proximate result of Defendants' conspiracy, Defendants caused actual damages to NSAL in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

180.    Plaintiff incorporates by reference the above paragraphs as if fully stated here.

181.    As a result of the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme, Defendants have been unjustly enriched at the expense of NSAL.

182.    Defendants should be required to disgorge and return to NSAL the gains they or their family members wrongfully obtained at the expense of NSAL, including but not limited to

the monetary equivalent of all payments received through the Fraudulent Invoices Scheme, the

Bunker Fuel Scheme, and the Personal Piggybank Scheme.

## SEVENTH CAUSE OF ACTION

### Declaratory Judgment

183.    Plaintiff incorporates by reference the above paragraphs as if fully stated here.

184.    An actual controversy has arisen in the wake of the discovery of the Fraudulent

Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme.  NSAL faces a

critical risk that it will continue to be damaged by Defendants, who remain substantial indirect

stockholders in NSAL, and who continue to maintain a substantial presence within the Company

via relationships with multiple current and former Company employees and vendors.

185.    Pursuant to its authority, this Court should enter a judgment declaring, among other

things, the following:

    a.  Defendant Claudio Lopez owed legal duties to NSAL at all relevant times;

    b.  Defendant Carlos Lopez owed legal duties to NSAL at all relevant times;

    c.  Defendant Claudio Lopez breached these duties by, among other things, (i)
     orchestrating and perpetrating the Fraudulent Invoices Scheme; (ii) facilitating and
     approving the Bunker Fuel Scheme to the Company's detriment; and (iii) using the
     Company's petty cash accounts and credit accounts to pay for his and his family's
     personal expenses;

    d.  Defendant Carlos Lopez breached these duties by, among other things, (i)
     orchestrating and perpetrating the Fraudulent Invoices Scheme; (ii) facilitating and
     approving the Bunker Fuel Scheme to the Company's detriment; and (iii) using the

Company's petty cash accounts and credit accounts to pay for his and his family's personal expenses;

e.  Defendant Claudio Lopez continues to intentionally misrepresent and conceal facts to NSAL regarding the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme;

f.  Defendant Carlos Lopez continues to intentionally misrepresent and conceal facts to NSAL regarding the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme;

g.  Defendant Claudio Lopez continues to intentionally, wrongfully and impermissibly exercise dominion over NSAL's funds fraudulently taken through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme;

h.  Defendant Carlos Lopez continues to intentionally, wrongfully  and impermissibly exercise dominion over NSAL's funds fraudulently taken through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme;

i.  Defendant Claudio Lopez, along with Carlos Lopez, Co-Conspirator 1, and several other unnamed co-conspirators, were engaged in an express or tacit agreement to achieve an unlawful end: namely, misappropriating millions of dollars in NSAL funds for his own benefit and the benefit of the Lopez Family through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme; and

j.  Defendant Carlos Lopez, along with Claudio Lopez, Co-Conspirator 1, and several other unnamed co-conspirators, were engaged in an express or tacit agreement to achieve an unlawful end: namely, misappropriating millions of dollars in NSAL

funds for his own benefit and the benefit of the Lopez Family through the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully prays for relief as follows:

a. Awarding Plaintiff damages (including actual damages, direct damages, indirect damages, consequential damages, incidental damages, exemplary damages, punitive damages, and all other damages recoverable under applicable law), together with pre- and post-judgment interest, all in an amount to be proven at trial;

b. Declaratory relief as described herein;

c. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees; and

d. Granting Plaintiff any other relief that the Court may deem just and proper.

Dated: November 27, 2024

Respectfully submitted,

By:

REEDER & SIMPSON, P.C.
Dennis J. Reeder
Bar Certificate No. 80
P.O. Box 601
Majuro, MH  96960
Telephone: +1-692-625-3602
Honolulu Telephone: 808-352-0749
Email: dreeder.rmi@gmail.com

44

ISRAEL DAVID LLC
Israel David (*pro hac vice* forthcoming)
Andrew Cauchi (*pro hac vice* forthcoming)
17 State Street, Suite 4010
New York, NY  10004
212-739-0622
israel.david@davidllc.com
andrew.cauchi@davidllc.com

ISRAEL DAVID LLC
Mark A. Cianci (*pro hac vice* forthcoming)
399 Boylston Street, Floor 6, Suite 23
Boston, MA  02116
617-295-7771
mark.cianci@davidllc.com

EXHIBIT 2

We, CLAUDIO LOPEZ , with offices located at Aviadores del Chaco 1669, piso 3 , Asuncion (Paraguay), acting in my capacity of President of NYA Corp, sole member of Boca World LLC, a New York Limited Liability Corp.  do hereby certify the following:

    a)  That the Company was incorporated in the state of New York (USA) by means of  Reg  CASH 100507000190 – Film #100507000181 of May 07, 2010.

    b)  That the Initial Capital Contribution is Two Millons Four Hundred Thousand US Dollars.

    c)  That the Company is domiciled in the State of New York.

    d)  That the Company is in good standing under the laws of the State of New York.

    e)  That the current Directors and Officers of the Company are: **DIRECTOR/PRESIDENT – CLAUDIO PABLO LOPEZ**

    f)  That the current sole Member is NYA Corp of Marshall Island

Dated this MAY 14, 2020.

_____
CLAUDIO LOPEZ
PRESIDENT

I, Marinel Ramos of Buenos Aires Argentina, lawyer, certify that this document of certificate of incumbency of Boca World LLC, is a true and correct copy of the original I have Sighted.
Date: 7/6/2020
Email: marinelr1@outlook.com
Telephone: +54 11 4891-7723
Capacity: lawyer