UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: EX PARTE APPLICATION OF NAVIOS SOUTH AMERICAN LOGISTICS INC. | Case No. 1:24-mc-00575-LJL<br><br>DECLARATION OF ISRAEL DAVID IN SUPPORT OF NAVIOS SOUTH AMERICAN LOGISTICS INC.'S RESPONSE TO ORDER TO SHOW CAUSE |

I, Israel David, being competent to testify, make the following declaration:

1.  I am a partner at Israel David LLC. I am admitted to practice in this District. I submit this declaration in support of Navios South American Logistics Inc.'s Response to the Order to Show Cause dated December 24, 2024 (ECF No. 14). Except as otherwise noted, I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called upon to do so.

2.  I am of counsel to Navios South American Logistics Inc. ("NSAL" or, inclusive of its subsidiaries, the "Company") in a civil action currently pending in the High Court of The Republic of The Marshall Islands, captioned *Navios South American Logistics Inc., a Republic of the Marshall Islands Corporation v. Claudio Pablo Lopez and Carlos Augusto Lopez* (the "Marshall Islands Lawsuit"). The Marshall Islands Lawsuit was filed on November 27, 2024.

3.  By way of brief background relevant to the Marshall Islands Lawsuit, NSAL is incorporated in the Marshall Islands and is one of the largest infrastructure and logistics companies in the Hidrovia region of South America. Claudio Pablo Lopez ("Claudio Lopez") previously served as a member of the Board of Directors of NSAL from January 3, 2008 until August 19,

1

2024. He also previously served as NSAL's Chief Executive Officer from January 3, 2008 until October 6, 2022. Carlos Augusto Lopez ("Carlos Lopez"), a brother of Claudio Lopez, previously served as a member of the Board of Directors of NSAL from January 3, 2008 until October 6, 2022, and as NSAL's Chief Commercial Officer during that same period.

### *The Marshall Islands Lawsuit*

4. As more fully set forth in the complaint filed in the Marshall Islands Lawsuit (the "Marshall Islands Complaint"), Claudio Lopez and Carlos Lopez (the "MI Defendants"), for at least the past ten years, are alleged to have engaged in a shockingly brazen scheme to defraud NSAL out of millions of dollars – an alleged scheme by which fake and forged invoices were created and accounting records were falsified, at the direction of the MI Defendants, in order to conceal improper payments made by the Company to the MI Defendants and members of their family in Buenos Aires, at the request and direction of the MI Defendants (the "Fraudulent Invoices Scheme"). What follows (in Paragraphs 5-11) is a brief description of the Marshall Islands Complaint's allegations against the MI Defendants. A true and correct copy of the Marshall Islands Complaint is attached as Exhibit 1 to the Declaration of Kevin J. Lennon (the "Lennon Decl."). *See* ECF No. 3.

5. At a high level, the Fraudulent Invoices Scheme worked as follows: at the direction and behest of the MI Defendants, a small handful of individuals at the Company were instructed to make enormous amounts of cash available to the MI Defendants and other members of their family (the "Lopez Family") out of Company funds. As orchestrated by the MI Defendants, these individuals concealed each illicit cash payment to the MI Defendants and their family by generating a fictitious invoice pursuant to which a demand for Company funds would then be made. The amount of the demand would cover the illegitimate payment being made to the MI

Defendants and other members of the Lopez Family, as well as, on many or most occasions, a fee to be paid to the MI Defendants' "fixer" in consideration for facilitating the payment of stolen Company funds.

6. In response to this demand, a Company employee – working at the direction and behest of the MI Defendants – would issue a Company check made out to an individual, who would then physically visit the bank and make a cash withdrawal in person. At the MI Defendants' direction, the cash would then be transported to a money exchange for onward transfer to Buenos Aires for the benefit of the MI Defendants and certain other members of the Lopez Family. At times, due to the sheer amount of physical cash being transferred, an armored vehicle company would be engaged to transport the money from the bank in Paraguay that held the Company's accounts to the money exchange. The use of armored vehicles for transporting cash was entirely unprecedented at the Company and was purely a function of the MI Defendants' theft of Company funds.

7. To conceal this flagrant and enormous theft of Company money, the MI Defendants directed that forged or fake invoices repeatedly be created to record the transactions as purported payments to Company vendors. In reality, no such legitimate payments were actually made to these vendors in relation to these invoices. The money instead went to the MI Defendants and other members of the Lopez Family. The forged invoices were created by starting with otherwise legitimate invoices from vendors, which individuals at the Company, as directed by and on behalf of the MI Defendants, then altered to reflect fictitious scopes of work, with associated charges equaling the exact amounts withdrawn for the illicit payments to the MI Defendants.

8. In addition to the *forged* invoices, the MI Defendants and their accomplices orchestrated numerous *fake* invoices, issued by a handful of vendors who agreed to be part of the

MI Defendants' scheme by explicitly permitting the MI Defendants to generate invoices for fictitious, non-existent work. The fake invoices falsely reflected the misappropriated payments in cash to the MI Defendants as expenses for Company projects. Due to Company practices and processes, some Company projects required additional supporting documents before payments could be recorded within the Company's accounting system. In these instances, the MI Defendants and other members of the Lopez Family instructed individuals at the Company to create fictitious purchase orders and other concocted supporting documentation in order to enhance the apparent (but non-existent) legitimacy of the fraudulent invoices.

9. All told, between 2015 and 2020, the MI Defendants looted at least approximately $8.2 million in Company funds through the Fraudulent Invoices Scheme, which involved ten (or more) external vendors and several individuals acting at the direction of the MI Defendants. NSAL's investigation into the Fraudulent Invoices Scheme is still ongoing and may well reveal further extensive misconduct and misappropriation by the MI Defendants, including for periods prior to 2015.

10. The MI Defendants further caused the Company substantial harm by authorizing and permitting Maria Lopez, Claudio Lopez's daughter and Carlos Lopez's niece, to share confidential Company information regarding bunker fuel supplier bids with Ms. Lopez's husband's company, one of the Company's fuel suppliers. The Company's policy and standard practice was to invite competitive bids from multiple fuel suppliers in order to secure requisite fuel for the Company's operations. But the MI Defendants authorized and permitted the Company's fuel bidding process to be corrupted and rigged in favor of the Lopez Family, impermissibly steered Company funds to the Lopez Family through contracts with Ms. Lopez's husband's company, forced the Company to receive substandard and insufficient services from this supplier, and caused

the Company to incur losses based on the terms of the contracts with this supplier (the "Bunker Fuel Scheme").

11.  Throughout this time, the MI Defendants further looted the Company's coffers by using Company "petty cash" and other accounts for luxury personal and family expenses entirely unconnected to Company business, including expensive cigars, high-end personal transportation expenses (such as expenses for the MI Defendants' private plane deployed for personal travel), a specialized washing machine designed to launder horse blankets, robot vacuum cleaners, a clothes dryer, and other expenses for miscellaneous and unauthorized personal goods and services (the Personal Piggybank Scheme").

### The Uruguay Proceeding

12.  I understand from their motion to intervene in this action that the MI Defendants assert that the Marshall Islands Lawsuit was filed as a manner or mode of "forum shopping" in response to the Uruguay Proceeding (as defined below in Paragraph 13). That assertion is false. As detailed below, it is also preposterous. NSAL was completely unaware of the Uruguay Proceeding when it filed the Marshall Islands Lawsuit on November 27, 2024. NSAL first learned of the Uruguay Proceeding on December 3, 2024, when the Uruguay court – which had been proceeding on an *ex parte* basis at the request of Claudio Lopez and Peers (as defined in the following paragraph) – issued an order on notice to NSAL requiring NSAL to produce certain of its books and records to Claudio Lopez and Peers.

13.  By way of background, on October 1, 2024, Claudio Lopez and Peers Business Inc. ("Peers"), a Panama-incorporated entity through which Claudio and Carlos Lopez (along with certain other members of the Lopez Family) indirectly hold approximately 36.2% of NSAL's common stock, commenced – on an *ex parte* basis – a proceeding in the Uruguay courts seeking

5

various books and records of NSAL (the "Uruguay Proceeding").

14. At its core, albeit among other supposed grievances, Claudio Lopez's and Peers's principal argument in the Uruguay Proceeding for the production of said records is that they purportedly need these documents to investigate whether they might have a claim against one or more NSAL directors arising from an August 1, 2024, refinancing transaction in which, as part of a larger series of transactions, an entity affiliated with NSAL's Chairwoman made an approximately $160 million loan to NSAL (the "Subordinated Loan"). In particular, Claudio Lopez and Peers purport to complain that, under the terms of the Subordinated Loan, NSAL's Chairwoman could convert the debt into common stock of NSAL, thereby diluting Peers's minority interest in NSAL. As detailed below, the Lopezes' purported grievances regarding the Subordinated Loan appear to be an ill-advised attempt to distract attention from the shocking allegations of fraud and theft under the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, and the Personal Piggybank Scheme.

15. On December 2, 2024, the court in the Uruguay Proceeding issued an order requiring the Company to provide the requested books and records to Claudio Lopez and Peers within 15 days of the order.

16. Notwithstanding that the Company has a presence in Uruguay, Claudio Lopez and Peers inexplicably brought the Uruguay Proceeding secretly and on an *ex parte* basis. NSAL was completely unaware of the Uruguay Proceeding until it received a copy of the Uruguay Proceeding petition and order on December 3, 2024, as described in paragraph 12, above.

17. In addition to being false, the suggestion that the Marshall Islands Lawsuit was filed in response to the Uruguay Proceeding – or, as I understand the Lopez brothers have suggested, in order to obtain an order of attachment from the New York State courts – is preposterous.

18. The Marshall Islands Lawsuit was filed for the most obvious of reasons: to obtain monetary relief (and other judicially-ordered relief) for NSAL – and to recover from the Lopez brothers – for the enormous losses it suffered as a result of one of the more shocking corporate frauds and thefts in recent years, as alleged with great specificity and detail in the 44-page Marshall Islands Complaint.

19. In this regard, it is useful to describe here the general timeline that led to the November 27, 2024 filing of the Marhsall Islands Lawsuit – again, well before NSAL learned on December 3, 2024 of the ill-designed Uruguay Proceeding – as alleged in Paragraphs 137-146 of the Marshall Islands Complaint. *See* Lennon Decl., Exhibit 1, ECF No. 3.

20. As alleged in the Marshall Islands Complaint, "Defendants intentionally concealed the Fraudulent Invoices Scheme, the Bunker Fuel Scheme, the Personal Piggybank Scheme, and all other wrongful conduct alleged herein, and as a result NSAL could not have uncovered Defendants' wrongdoing prior to now." *Id.* at ¶ 145.

21. Thus, "[o]nly in the spring of 2024 did new management at the Company first begin to glean hints of potential wrongdoing that may have occurred during Defendants' tenure as Directors and senior executives at NSAL. The Company's new management team immediately set about reviewing past practices at the Company. Within a few months, by the summer of 2024, it became apparent that serious, alarming defalcations of duty by Defendants might have occurred during Defendants' tenure as Directors and senior executives at NSAL. New management then promptly engaged a leading law firm (based in Europe) [namely, Wikborg Rein LLP], which in turn engaged a globally-leading investigative firm [namely, K2 Integrity], with further assistance from a globally-leading accounting firm [namely, Grant Thornton], to forensically examine the Company's books and records. Those firms moved with all due care and diligence. Only now can

this lawsuit be brought with all due alacrity at the earliest moment wherein NSAL can responsibly assert the serious allegations and claims made [in the Marshall Islands Complaint]." *Id*. at ¶ 146.

22.     In short, the Marshall Islands Lawsuit was filed for the exact same reason any victim of a fraud – let alone a massive fraud such as that alleged here – files suit: to recover the looted money.

### *NSAL's Response to The Uruguay Proceeding*

23.     On December 11, 2024, Uruguay counsel for NSAL (namely, Lapique & Santeugini) filed an appeal in the Uruguay Proceeding, requesting that the court reconsider its December 2, 2024 order and reject Claudio Lopez's and Peers's request for NSAL's book and records. Among other arguments made by NSAL in its appeal are the following points:

   a. It was procedural error under applicable Uruguayan law for the Uruguay court to hear this matter on a unilateral *ex parte* basis without giving NSAL the opportunity to be heard prior to the issuance of the December 2, 2024 order;

   b. Uruguayan courts lack jurisdiction with regards to a books-and-records demand made upon a Marshall Islands corporation;

   c. Book-and-records demands upon a Marshall Islands corporation are governed by Marshall Islands law, not Uruguayan law, and such Marshall Islands law should be applied by a Marshall Islands court, not a Uruguayan court;

   d. The Uruguay Proceeding is an attempted end-run around – and away from – the Marshall Islands courts;

   e. Inasmuch as Claudio Lopez was a director of a Marshall Islands corporation

8

(NSAL) and both he and Peers are, respectively, indirect and direct significant holders of stock in the Marshall Islands corporation at issue (NSAL), their purported grievances regarding the conduct of any members of the NSAL Board of Directors should be heard by the Marshall Islands courts, not Uruguayan courts;

f. The Subordinated Loan – which is the issue that Claudio Lopez and Peers supposedly want to investigate via their book-and-records demand in the Uruguay Proceeding – has absolutely nothing whatsoever to do with Uruguay, much less the Uruguayan courts. Namely, (1) the Subordinated Loan was negotiated and approved by NSAL's Conflicts Committee (consisting of an Asian-based director and European-based director) which committee was advised by its New York-based independent counsel (Latham & Watkins LLP) and its U.S.-based independent financial advisor (Jefferies LLC); (2) the Subordinated Loan was approved at an NSAL Board of Directors meeting held in Athens, Greece; (3) the documents relating to the Subordinated Loan are not now – and never were – located in Uruguay; (4) the documents relating to the Subordinated Loan are not governed by Uruguayan law; and (5) virtually everything related to the propriety or impropriety of the Subordinated Loan, including that loan's approval by the NSAL Board of Directors, is governed by Marshall Islands law, not Uruguayan law.

g. The Uruguay Proceeding – and Claudio Lopez's and Peers's purported complaints regarding the Subordinated Loan together with their books-and-

9

records demand – are merely a ruse to distract attention from the Fraudulent Invoices Scheme; this point is supported by, among multiple other telltale signs, the fact that Lopezes' first request for NSAL documents was made eight weeks after they were put on notice (in writing) that NSAL was conducting an investigation into various accounting irregularities, which writing put the Lopez brothers on notice that the shocking alleged Fraudulent Invoices Scheme would be discovered by NSAL in short order.

24. The Uruguay court has yet to rule on NSAL's appeal. A ruling is anticipated to issue in or around February 2025.

### *The Purported Counterclaims*

25. I understand that Claudio and Carlos Lopez state that they will assert counterclaims in the Marshall Islands Lawsuit relating to the Subordinated Loan. This appears to be incorrect. The sole plaintiff in the Marshall Islands Lawsuit is NSAL. As detailed above, NSAL – and NSAL alone – has sued Claudio and Carlos Lopez for their role in orchestrating and leading the shocking fraud alleged in the Marshall Islands Complaint. Claudio and Carlos Lopez have no known counterclaims (or any other claims) against NSAL.

26. Instead, to the extent the Lopez brothers are truly unhappy with the Subordinated Loan – notwithstanding that that loan actually helped rescue NSAL from financial peril as detailed below – and truly believe that NSAL's Chairwoman or the members of the Conflicts Committee breached their fiduciary duties in connection with negotiating and approving the Subordinated Loan, those infirm claims should be directed at those NSAL directors.

27. But they are not claims or counterclaims that can properly be brought against NSAL. NSAL is, after all, a corporation, and Delaware law – which the Marshall Islands

incorporates in matters of corporate governance; *see Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 397 (S.D.N.Y. 2011) – is clear that corporations do not owe anyone any fiduciary duties. Rather, directors owe fiduciary duties, not corporations. Thus, Claudio and Carlos Lopez do not have counterclaims against NSAL relating to the Subordinated Loan.

28. It also bears noting that these purported "counterclaims" (if they are ever brought) cannot withstand scrutiny, which is likely the reason why the Lopez brothers have not asserted any such claims in the five months that have elapsed since the Subordinated Loan. Put simply, it was an unremarkable related-party corporate transaction fully negotiated and approved by a Conflicts Committee consisting of two independent directors who were advised by independent legal and financial advisors at Latham & Watkins LLP and Jefferies LLC, respectively. Under Delaware law, and therefore by extension Marshall Islands law, that claim would go nowhere.

29. Some brief background regarding the Subordinated Loan further illustrates the additional insuperable hurdles any claim would face, as follows.

30. NSAL's situation was critical. In mid 2024, NSAL had to face the repayment of a debt liability of approximately $500 million under its Senior Secured Notes, which would become current (*i.e.*, payable within twelve months) in the books of the company as of July 1, 2024. For over two years, NSAL diligently looked for financing alternatives. NSAL's Board of Directors, which included Claudio Lopez during this period, was aware of the different financing alternatives that were being sought to refinance the $500 million debt. The Board of Directors, including Claudio Lopez, was aware that there were no third parties willing to lend the full amount required for the refinancing of the debt. Therefore, NSAL had to resort to substantial, additional subordinated financial assistance, by way of debt and/or equity, which was also not available from third parties. However, neither Claudio Lopez nor Peers ever offered to contribute to the

11

refinancing of the debt of NSAL.

31. In June 2024, the Company obtained a syndicated loan and other third-party financing in the aggregate amount of approximately $350 million. The remaining $160.2 million was offered by an entity affiliated with Mrs. Angeliki Frangou, the Chairwoman of NSAL's Board of Directors, to cover the shortfall given that NSAL needed approximately $500 million to refinance its Senior Secured Notes. This is what is referred to herein as the Subordinated Loan, as defined above. Since this entailed a transaction between NSAL and an entity affiliated with the Chairwoman of the Board of Directors, the Subordinated Loan was considered and approved by NSAL's Conflicts Committee, which is composed of two independent directors in that they are not executives and have no other material relationship with NSAL other than serving as independent directors. As noted, the Conflicts Committee acted on independent, third-party legal and financial advice from Latham & Watkins LLP and Jefferies LLC, respectively.

32. Against this backdrop, the Lopez brothers have no complaint. Yet, to distract from the shocking fraud alleged against them as reflected in the Marshall Islands Complaint, they now purport to question the independence of the two members of the Conflicts Committee, despite having consented to their independence on at least three prior occasions with no reservations. To wit, the Conflicts Committee was constituted in March 2023 and was unanimously approved, as was the Conflicts Committee charter, by NSAL's Board of Directors, including Claudio Lopez, without reservation. The Conflicts Committee has the power to approve transactions with parties related to NSAL, and indeed had, prior to the Subordinated Loan, already approved two other transactions with related parties, without any reservations asserted by Claudio Lopez. It is thus clear that the Lopez brothers' newfound questions regarding the independence of the Conflicts Committee are purely pretextual.

*Marshall Islands' Interest in This Matter*

33. It should be needless to say that a Marshall Islands corporation's claims against directors of such Marshall Island corporation for allegedly stealing millions of dollars in cash from the corporation are most suitably brought and heard in the courts of the Marshall Islands. This is all the more so true here, where the directors who engaged in the alleged defalcation are also significant (albeit minority) shareholders in the victimized Marshall Islands corporation.

34. The purpose of the ancillary proceedings initiated by NSAL in state and federal court in New York is to support NSAL's efforts at recovering from the MI Defendants in the headline Marshal Islands Lawsuit – namely, by enabling NSAL to obtain discovery relating to the MI Defendants' fraudulent schemes and to prevent the MI Defendants from improperly disposing of assets that should remain available to satisfy the anticipated judgment against the MI Defendants in the Marshall Islands Lawsuit. The notion that the Marshall Islands Lawsuit is somehow just a pretext for ancillary proceedings in New York, whereas in reality the Marshall Islands Lawsuit is the only proceeding in which NSAL has asserted its substantive claims for damages against the MI Defendants, is utterly preposterous.

*Communication with Freshfields*

35. I understand that counsel for Claudio and Carlos Lopez suggests that the Lopez brothers are represented by Freshfields in New York on these or related matters. *See*, Declaration of Silvia Bolatti, ECF No. 31 at ¶ 10; Memorandum of Law, ECF No. 13-5 at 3. That is inaccurate. On November 4, 2024, I sent an email to Mr. Thomas W. Walsh, a litigation partner at Freshfields US LLP, attaching a letter to Mr. Walsh providing an update regarding NSAL's investigation into the alleged wrongdoing that occurred during Claudio and Carlos Lopez's tenures as directors and senior executives at NSAL. I sent that email and letter to Mr. Walsh because he had previously

13

engaged with me regarding these matters and thus appeared to be counsel to Claudio Lopez, Carlos Lopez, and/or Peers.

36. Mr. Walsh's response was swift and unequivocal. Specifically, that evening, Mr. Walsh responded as follows: "Dear Mr. David, Please be advised that Freshfields does not represent Mr. Claudio Lopez or Mr. Carlos Lopez. Sincerely, Thomas W. Walsh." A true and correct copy of that email thread is attached hereto as Exhibit 1.

37. That was the final communication NSAL or I had with Freshfields regarding this or any other matter.

I declare under penalty of perjury under the laws of the State of New York and the United States that the foregoing is true and correct, and that this declaration was executed in the State of New York on this 6th day of January 2025.

Dated: January 6, 2025                                                  Respectfully Submitted

                                                                        /s/ Israel David
                                                                        Israel David

## **CERTIFICATION OF SERVICE**

I certify that on January 6, 2025 I electronically filed the foregoing document and that it is available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF System.

*/s/ Patrick F. Lennon*

_____
Patrick F. Lennon